## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION


**SONORA JORDAN,**

      **Plaintiff,**

**vs.**                      **Case No.  5:11-CV-00383-CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


### MEMORANDUM OPINION AND ORDER

      This is a Social Security case referred to the undersigned United States Magistrate Judge upon consent of the parties and reference by District Chief Judge M. Casey Rodgers.  Doc. 7.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire Record, the Court affirms the decision of the Commissioner.

## I.  Procedural Status of the Case

      On February 12, 2010, Plaintiff, Sonora Jordan, filed a Title II application for a period of disability and Disability Insurance Benefits (DIB), alleging disability beginning February 2, 2010.  R. 10.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured or the date by which her disability must have commenced in order to receive benefits under Title II is December 31, 2014.  *Id.*

Plaintiff's application was denied initially on June 7, 2010, and upon reconsideration on August 20, 2010. *Id.* On August 20, 2010, Plaintiff filed a request for hearing. *Id.* On May 12, 2011, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Amy Uren in Tallahassee, Florida. Jackson C. McKay, an impartial vocational expert, testified during the hearing. *Id.* at 71-75, 120 (Resume). Plaintiff was represented by David E. Evans, an attorney. *Id.* at 10, 19, 21-22.

On June 24, 2011, the ALJ issued a Decision denying Plaintiff's application for benefits. *Id.* at 10-18. Plaintiff filed a request for review, which was denied by the Appeals Council on September 23, 2011. *Id.* at 1-3. On or about July 7, 2011, Plaintiff submitted a two-page, handwritten letter to the Appeals Council. *Id.* at 1-5, 239-40.

On November 23, 2011, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision. The parties filed memoranda of law, docs. 12 and 14, and Plaintiff filed a response, doc. 16, and those have been considered.

## II.  Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2014." R. 12.

2. Plaintiff "has not engaged in substantial gainful activity since February 2, 2010, the alleged onset date." *Id.*

3. Plaintiff has several severe impairments: "bilateral sacroiliitis; diverticulosis; lumbago; obesity; and levoscoliosis of the lumbar region with spondylitic end plate hypertrophy with no canal encroachment." *Id.* at 12-13.

4.  Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 13.

5.  Plaintiff has the residual functional capacity (RFC) "to perform light work as defined in 20 CFR 404.1567(b) except that she can only occasionally climb ramps and stairs; she can only occasionally balance, stoop, kneel, crouch and crawl; and she must not use ladders, ropes or scaffolds." *Id.* at 13-17.

6.  Plaintiff "is capable of performing past relevant work as a poultry dresser worker and as a fast food worker.  This work does not require the performance of work-related activities precluded by the [Plaintiff's RFC]." These jobs have a Specific Vocational Preparation Level (SVP) of 2 and an exertional level of "light."  *Id.* at 17-18.

## III.  Legal Standards Guiding Judicial Review

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial

evidence is more than a scintilla, but less than a preponderance.  It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

---

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. See 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v):

1.      Is the individual currently engaged in substantial gainful activity?

---

record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g); 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  See Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  See Wilson, 284 F.3d at 1225.  Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true.  Id.

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  See 20 C.F.R §§ 404.1529; 416.929 (explaining how symptoms and pain are evaluated); 404.1545(e); 416.945(e) (regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.  Who else is better able to determine the existence of an underlying medical condition that can reasonably be expected to give rise to the claimed pain than the treating physician?  That is why it is

so well-established that the treating physician's opinion as to the existence and effects of pain must be given substantial weight.  *See, e.g.*, <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that opinion of treating physician that claimant suffers from disabling pain must be accepted as true).

It is true that an ALJ may credit subjective pain testimony even if objective evidence is lacking.  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

## IV. Evidence from the Administrative Hearing

### A. Sonora Jordan (Plaintiff)

Ms. Jordan was born on January 13, 1955, and was 56 years old as of the hearing.  R. 26, 53.  She has a high school education and attended FMU in 1978.  She is right-handed.  She has never had a driver's license and cannot drive.  *Id.* at 26-27.  She has a girl that will take her around.  Sometimes she uses the bus system to get around.  *Id.* at 27.

Ms. Jordan is 5 feet tall and weighs about 250 pounds.  *Id.* at 36.  Ms. Jordan is single and has no children.  She lives in her home (with her brother) that she owns and has no mortgage payment.  *Id.* at 27-28.  Ms. Jordan has no current source of income

and is not working.  She has been paying her bills by selling "stuff out of [her] house" in order to keep her lights and water on.  *Id.* at 28.

She last worked at McDonald's in 2010.  Ms. Jordan had a pending worker's compensation case and went to trial.  It appears that during the trial she was asked "about her accident and stuff" and she was told that "[she] had to resign immediately."  *Id.* at 28-29.  Ms. Jordan has not looked for work after resigning from McDonald's in February 2010.[2]  It appears Ms. Jordan reached a settlement of her worker's compensation claim.  *Id.* at 14.

Ms. Jordan says she was denied unemployment benefits, *id.* at 29, although it is stated in her application summary for SSI that she was receiving unemployment compensation from the state of Florida of $700 a month from February 2010 and thereafter.  *Id.* at 133.

---

[2]  In her Decision, the ALJ recounted that Ms. Jordan testified she did not work after February 2, 2010.  *Id.* at 12, 24.  Notwithstanding, the ALJ found that Plaintiff's "record reflects earnings of $8858.96 in 2010, $7675.00 of which was reported as self-employment income," and found it doubtful that she could have earned this income between January 1, 2010, and February 2, 2010.  (This issue was raised by the ALJ at the outset of the hearing.  *Id.* at 24.)  Ms. Jordan was unable to explain these "self-employment earnings" or "produce income tax records for the 2010 tax year."  "She denied knowledge of claiming an earned income tax credit."  The ALJ found "[t]he lack of explanation weigh[ed] against [her] credibility.  However, giving [her] every benefit in this case, [the ALJ] deferred further development of this issue and" proceeded with the sequential evaluation process.  *Id.* at 12.  The ALJ did not cite to the Record when making the findings as to the 2010 earnings mentioned above and there has been no citation to the Record regarding these amounts.  (The Commissioner cites to pages 12 (ALJ decision), 24-25 (hearing transcript), and 140 (wage information) of the Record when referring to these earnings, but these references do not support the ALJ's findings.  *See* doc. 15 at 7.)  There is a reference on the "Full DIB Review Sheet," query date of January 14, 2011, stating wages of $1,183.00 for the first quarter of 2010.  *Id.* at 150; *see id.* at 140 (1st quarter of 2010).  There are also references that no wages were paid in 2010, except for the $1,183.00 stated above.  *Id.* at 136, 139-41, 143, 145, 147, 149, 157-58.  The difference between $8,858.96 and $7,675.00 is $1,183.96.  The amount of $7,675.00 does not appear to be mentioned in the Record.  (Plaintiff earned $11,960.66 in 2009.  *Id.* at 140, 143, 149-50.)

Ms. Jordan started working at McDonald's in 2005.  She "was a prep.  [She] did all the salads and pulled the breakfast," so when orders were made, the food was ready to go.  *Id.* at 29.  For example, she prepared the breakfast items so they would be ready to be cooked.  *Id.* at 30.  She also "did French fries."  She never ran the cash register.  *Id.* Prior to this appointment, she also worked for another McDonald's, but under different ownership.  *Id.*

Prior to her employment with McDonald's, she worked for Perdue Farms for 25 years.  She did "[l]iterally everything.  [She] peeled gizzards, cooked, processed the chicken, cutting, you know, the parts and stuff up."  *Id.* at 30-31; 138-39.  Her work at McDonald's and Perdue Farms covers her work for the past 15 years.  *Id.* at 31.

While she was working at McDonald's, she was having back pains and her legs and ankles swelled.  "[Her] bowels [were] running out of [her]."  *Id.*  Ms. Jordan still has problems sitting.  When she sits for a long time, she starts having cramps in her back and it becomes uncomfortable, and she tries to shift and it gets worse.  *Id.* at 32.  Ms. Jordan says she can sit for about 10 or 15 minutes before she has a problem and she has to get up and move.  *Id.*  Her back was beginning to bother her during the hearing.  *Id.*

Ms. Jordan says she has trouble with standing and sitting too long.  *Id.* at 33.  She also has problems lifting.  Her "brother carries everything for [her] because [she] can't carry nothing."  *Id.*  She "feel[s] it" when she gets a gallon of milk out of the refrigerator on her own.  She barely gets it out of the refrigerator when she has to call her brother to help her.  *Id.*

Ms. Jordan also described other problems she has with working such as having pains in her toes and feet that happens a lot, "[e]very week." *Id.* at 37-38.

Her brother accompanies her to the grocery store, although it does not take her very long walk around store. *Id.* at 33-34.

She is able to dress herself every day on her own but "[i]t take[s] a little while." *Id.* at 34.

She takes two prescription drugs every day for pain. They help some but the pain is still there when the medication wears off. *Id.* at 34.

Her pain keeps her from doing things that she used to do, such as she used to volunteer for a year as a secretary (after working at McDonald's) and a superintendent at a Sunday school but she had to resign because she could not do them anymore. She stopped working as a secretary in the spring of 2010. *Id.* at 34-35. As the secretary, she did the minutes for the Sunday school classes and worked only on Sunday. *Id.* at 36.

During the hearing, the ALJ noticed that Ms. Jordan had a cane with prongs on the bottom. *Id.* at 31-32. Ms. Jordan received a cane as a gift and she uses it every day. Ms. Jordan says she cannot walk without it because if she does, she will "fall down because [her] knees give out." *Id.* at 32.

She's been having problems with her bowels (diarrhea). *Id.* at 36-37. She does not take medication for this problem and she had not talked to a doctor about it. *Id.* at 37. Ms. Jordan has no medical insurance. She has never had any mental health treatment from a psychiatrist. *Id.*

## B.  Jackson C. McKay (Vocational Expert)

Mr. McKay testified, without objection, as an impartial vocational expert.  *Id.* at 10, 38-43. The ALJ assumed that his testimony is consistent with the Dictionary of Titles (DOT).  *Id.* at 39.  Mr. McKay was present for Ms. Jordan's testimony.

Mr. McKay reviewed Plaintiff's work history over the past 15 years: poultry dressing worker (light category, unskilled, with a SVP of 2, and performed at the light level); and fast-food worker (light category, unskilled, with a SVP of 2 and performed at probably the medium level).  *Id.* at 39.

At this time in the hearing, the ALJ asked Ms. Jordan whether, at the time she was performing fast-food work, she was required to lift heavy things.  Ms. Jordan stated she had to lift strawberries, 40 eggs, hot cakes, and tortillas that were in boxes.  These items totaled about 70 pounds; however, Ms. Jordan had to lift "[a]bout 20 pounds" at one time.  *Id.* at 39-40.  Based on Ms. Jordan's testimony, Mr. McKay offered a clarification such that Ms. Jordan "did it right up to the limits of light which would be . . . 20 pounds."  *Id.* at 40.

The ALJ and Mr. McKay had the following colloquy:

Q: All right.  Mr. McKay, if you would please, consider an individual with the same age, educational and vocational background as the Claimant who is capable of performing light work at the full range.  Would such an individual be capable of performing the Claimant's past work?

A: Yes, ma'am.

Q: All right.  And that would be both?

A: Both.

Q: All right.

A: As performed and described.

Q: All right.  Let's see.  If you would please, assume an individual the same age, educational and vocational background as the Claimant who is capable of performing light work.  Who can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, with no use of ladders, ropes and scaffolds.

CLMT: Your Honor, could I get up for –

ALJ: Yes.

CLMT: -- a minute because my back is bothering me.

BY ADMINISTRATIVE LAW JUDGE:

Q: Would such an individual be capable of performing the claimant's past work?

A: Yes, ma'am.

Q: All right.  Would there be other work available in the national economy to such an individual?

A: We are using the second hypothetical, Your Honor?

Q: Yes.

A:  Yes, ma'am.  A parking lot cashier, 211.462-010, light, SVP of 2, unskilled, 58,000 in the national economy, 1400 in the State of Florida.  An office helper, 239.567-010, light, SVP of 2, unskilled, 136,000 in the national economy, 1800 in the state.

Q: All right.  If you would please, assume that an individual with the same age, educational and vocational background as the Claimant who is capable of sedentary work.  Who can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl with no use of ladders, ropes and scaffolds.  Would such an individual be capable of performing the Claimant's past work?

A: No, ma'am.

ALJ: All right.  Do you have a hypothetical you wish to add?

*Id*. at 40-42.  At this time, Ms. Jordan's counsel and Mr. McKay had the following

colloquy:

Q. No, I just--I'm curious about breaks, normal breaks that are allowed in a normal work environment.  Is there a break in the morning and a break in the afternoon?

A: Yeah.  Then you have your meal in the middle—

Q: Okay.

A: --of your shift.

Q: What about time, 15 minutes and 50?

A: Yeah, ten or 15 minutes usually, except the meal break is usually 30 minutes.

Q: Okay.  If it gets to be much more than 15 minutes on any one of those breaks though does that start to eliminate the work or what's--what would be tolerated I guess?

A:  Right.  You know a lot-- there may be some little leeway here and there for persons, otherwise getting the job done and showing up and being on time and all.  I just look at it sort of in a total amount of time the person may miss.  I think as you get--if a person is getting close to missing--is not productive ten percent of the time they're supposed to be working, which would total up to four hours a week--no, is that right?  No. Let me (inaudible).  Ten percent, yeah, four hours a week, right.  So that's 30 minutes a day excess.  I think that that begins to get noticed and it may not--a person may not be able to compensate for it by the end of the day and produce enough or work hard enough to retain employment.

ATTY: Okay. That's all I have, Your Honor.  Thank you.

*Id.* at 42-43.  The hearing then concluded.  *Id.* at 43.

### C.  Medical Evidence that Pre- and Post-Dates February 2, 2010 (Alleged Onset Date)

Plaintiff alleges disability beginning February 2, 2010, stemming from a "job-

related slip and fall accident that occurred on September 12, 2008.  [Plaintiff] was

walking into a cooler at McDonald's and slipped and fell onto her back."  R. 12, 14.

Following the incident, Ms. Jordan was treated by Panhandle Orthopaedics from

September 12, 2008, through August 25, 2009.

A radiology report dated September 12, 2008, revealed spurring off the tibial plateau of Plaintiff's right knee, spurring off the patella, and narrowing of the joint space with joint space narrowing off the distal femur and proximal tibia.  According to the reading radiologist, Ancil L. Lindley, III, M.D., there were moderately severe degenerative arthritic changes of the right knee and no obvious fracture of the left hand was detected.  *Id.* at 288.

On December 8, 2008, a radiology report of the lumbar spine showed diffuse degenerative facet disease greatest at L4-5 and L5-S1.  A degenerative arthritic change was also noted in the visualized lower thoracic spine of at least moderate degree.  *Id.* at 289.

Plaintiff was examined by Robert L. Teitelbaum, M.D., with a family physician specialty, for the first time on May 27, 2009.  *Id.* at 386-89, 400-03.  Medication was prescribed and X-rays requested.  Light work was included in the treatment plan.  Work-related lower back pain was assessed.  *Id.* at 387-88, 401-02.  No lifting ("lift-floor>waist") greater than 20 pounds and light work were noted.  *Id.* at 15, 389, 403.

On June 8, 2009, Plaintiff had sacrum and coccyx X-rays which revealed bilaterally symmetric sclerosis of the SI joints, more on the iliac side; bony variation in the sacrococcygeal region; bony prominence at the sacral coccygeal junction posteriorly; grossly appearing to represent developmental variation rather than post-injury.  *Id.* at 404.  X-rays of the Plaintiff's lumbosacral spine showed slight spondylosis endplate hypertrophy away from the canal L2-3 through L5-S1, and mild gradual levoscoliosis of the lumbar region.  *Id.* at 405.

On June 8, 2009, Plaintiff was examined again by Dr. Teitelbaum after the X-rays were taken.  *Id.* at 383, 397.  A diagnosis of lower back pain is noted.  Two prescriptions are noted including Flexeril.  *Id.* at 378, 384, 398.  The handwritten notes are difficult to read, but tenderness L3, L4 and spasm about lower spine is noted.  *Id.* at 383, 397. Dr. Teitelbaum noted under functional limitations and restrictions and specifically under functional activity of "lift-floor>waist": lifting no greater than 10 pounds every 10 minutes and light work.  *Id.* at 385, 399.

The next visit was on June 15, 2009, and Dr. Teitelbaum's diagnosis was lower back pain, work-related.  *Id.* at 380-82, 394-96.  Plaintiff was referred to orthopedic surgeon, Dr. Gilmore.  *Id.* at 381, 395.  Dr. Teitelbaum imposed the following functional limitations and restrictions and specifically under functional activity of "lift-waist>overhead": lifting no greater than 10 pounds every 10 minutes and light work.  *Id.* at 15, 382, 396.  Dr. Teitelbaum does not *mention a restriction in the "lift-floor>waist" category*.  *See id.*[3]  (Dr. Teitelbaum did not determine at this time whether there was "a residual clinical dysfunction or residual functional loss anticipated for the work-related

_____

[3]  Three forms filled out by Dr. Teitelbaum in May and June 2009, *id.* at 382, 385, 389, have the following language in common in paragraph 23: "The injured worker may return to activities so long as he/she is adheres to the functional limitations and restrictions identified below.  Identify ONLY those functional activities that have specific limitations and restrictions for this patient.  Identify joint and/or body part _____. Use additional sheet if needed."  *Id.* at 382, 385, 389.  "Lower back" is handwritten in the space provided.  The box beside paragraph 23 is checked.  *Id.*  Also, Dr. Teitelbaum did not check the box beside paragraph 22 that states: "The injured workers' functional limitations and restrictions, identified in detail below, are of such severity that he/she cannot perform activities, even at sedentary level (e.g. hospitalization, confident of impairment, infection, contagion), as of the following date: _____."  The space is left blank.  *Id.*

injury." The anticipated MMI could not be determined at this time. *Id.* at 382, 396.)[4]

The ALJ afforded Dr. Teitelbaum's assessment (limiting Plaintiff to light work) "significant weight" because it is consistent "with the overall evidence of record" and the ALJ's RFC assessment. *Id.* at 16. Also, after noting Dr. Teitelbaum's lifting restrictions, *see supra* at n.4, the ALJ stated: "There is no indication in the record that these restrictions, given in May and June 2009, were of a permanent nature. However, the light duty restriction portion of the opinion is consistent with the findings of the State agency consultant and with the observations of the claimant's physical therapist, discussed below." *Id.* at 15; *see also id.* at 16.

On July 14, 2009, Plaintiff was examined by Michael Gilmore, M.D., of Panhandle Orthopaedics, for low back pain. *Id.* at 244. Dr. Gilmore diagnosed her with intervertebral disc disorders: lumbago or sciatica due to displacement of intervertebral disc and low back pain. Dr. Gilmore also indicated that Plaintiff had a *mild* gait disturbance and tenderness of the lumbar spine, but normal to inspection. *Id.* at 244; *see infra* at n.5. Plaintiff was issued a transcutaneous electrical nerve stimulation (TENS) unit to help with controlling pain and relaxing muscle spasms. Meloxicam, Ranitidine, and Tramadol were prescribed. *Id.* at 245. Work status was noted as "light duty," "no lifting greater than 40-50," and "MMI." Physical therapy was recommended. *Id.*

---

[4] The ALJ discusses Dr. Teitelbaum's notes of May and June 2009. *Id.* at 15-16. The ALJ's reference to the 20 pound restriction is to the May 27, 2009, examination note, exhibit 11F at page 12, *id.* at 389, whereas the reference to the 10 pound restriction is to the June 15, 2009, examination, exhibit 11F at page 5, *id.* at 382. The ALJ refers to exhibit 11F at page 8, but that note pertains to the examination of June 8, 2009, 10 pound lift-floor>waist restriction, not the lift-waist>overhead restriction of June 15, 2009. *Id.* at 15; *see* doc.12 at 10.

On August 25, 2009, Ms. Jordan returned to Dr. Gilmore for her follow-up visit still complaining of lower back pain. *Id.* at 247. She reported feeling no change in the quality or severity of the pain and no problems with medications. Ms. Jordan was advised to continue with physical therapy. *Id.* Her medications were refilled. Her work status was noted as "return to regular duty." It was also noted that "MMI has been reached" and Plaintiff was assigned a permanent impairment rating (PIR) of 2 percent. *Id.* at 248.

Ms. Jordan received physical therapy at Select Physical Therapy from July 31, 2009, to August 28, 2009, due to lower back pain and a lumbar sprain. *Id.* at 252-58, 263-81.

As of July 31, 2009, Plaintiff was working a 4.5 hour shift. *Id.* at 256, 278. During her initial evaluation and physical therapy on July 31, 2009, Plaintiff showed decreased trunk and lower extremity (LE) strength and tenderness at the bilateral quadratus. *Id.* at 256, 279. She continued to complain of lower back pain stating that at times the pain reached a level of 10 on a pain scale from 1 to 10, describing the pain as aching down both sides of her back. *Id.* Objective examinations were performed. *Id.* at 257, 278-79.

On August 19, 2009, Plaintiff reported that she continued to have blood in her stool and that it had been getting worse since her fall. *Id.* at 275. She reported difficulty getting out of bed, chair, and shower, and lifting. She also reported having back pain when sitting to write. Further, the Plaintiff complained of abdominal pain on numerous occasions. *Id.* Her sitting tolerance was two hours. *Id.* at 275. Her standing tolerance was three hours before shifting around. *Id.* Plaintiff demonstrated a fair tolerance for

the exercises; mild increase in lower back pain (LBP) when "sitting for UBE and LE bike"; improved trunk and back lower extremity (B LE) strength and good progress toward goals.  *Id.* at 277.  Plaintiff continued with mild difficulty when performing floor to waist lift, improved technique was noted and "only occasional VC's required for postural control and functional squat."  *Id.*

On August 21, 2009, Plaintiff had physical therapy and reported similar problems. *Id.* at 252, 270.  Plaintiff demonstrated good activity with the exercises and showed improved core and abdominal control with floor-to-waist lift and supine bridges.  Plaintiff stated that the pain eases up with the exercises, though she reports moderate fatigue in her lower back and B LE's.  *Id.* at 252, 272-73.

On August 24, 2009, Plaintiff had physical therapy and reported similar problems, although she stated that she is feeling better in general.  *Id.* at 267.  Plaintiff continued to demonstrate good tolerance and control for the exercises and was able to progress through the full rehabilitation program without complaints of (c/o) pain or difficulty. Plaintiff noticed about a 50 percent overall improvement since beginning therapy.  *Id.* at 269.

On August 28, 2009, under the heading, "presentation," it is noted Plaintiff was able to work 4.5 hours without increased pain.  She continued to have pain, but noticed a decrease in frequency and duration of pain.  Plaintiff reported noticing a 50 percent overall improvement since beginning therapy.  Plaintiff continued to be limited in lifting, has 10/10 pain, and lower extremity strength deficits.  *Id.* at 254-55, 263-64.  Under the heading, "objective examination," flexibility, muscle testing (thoracolumbar planes and lower extremity MMT), and palpation (lumbosacral region), various test results are

compared from July 31, 2009, and August 24, 2009, with, for the most part, scores of +4/5 on the left and right.  *Id.* at 15, 254, 263.

Under the "problems and goals" heading, there are five problem areas identified. *Id.* at 255, 264.  In part, under problem number 2, "functional status: occupational requirements: Pt has to stand 8 hours with one 30 minute break. Pt has to squat and lift up to 30-40 pounds," it was also noted that Plaintiff was making good progress in lifting and was "okay" with lifting 15 pounds.  Immediately under this note, the following comment is made: "Functional Improvements In: [bullet point] Pt will be able to perform floor to waist lift with 35 pounds with proper body mechanics without symptoms increasing."  *Id.* at 15, 255, 264.  Plaintiff was discharged from physical therapy "due to work comp insurance not authorizing her visits" and with diagnoses of sprain of the lumbar region and lumbago.  *Id.* at 254-55, 263-64.

Ms. Jordan was admitted to Sacred Heart Hospital on September 18, 2009, with complaints of rectal bleeding, abdominal pain for greater than six months, dizziness, and being lightheaded.  Admission notes reveal the following.  *Id.* at 300-05.  There was no associated loss of appetite, vomiting, nausea, diarrhea, fever, chills, UTI symptoms, or trauma.  *Id.* at 300, 302.  Plaintiff denied "any previous and has no other current medical problems.  She does not take any medications that would predispose her to bleeding has never had any colon problems that she knows of."  *Id.* at 301.  A note under "musculoskeletal" states: "Negative musculoskeletal review of systems."  Her current medicines include three bottles of meds for her back pain with names unknown. Plaintiff's back injury in September 2008 is noted.  *Id.*  Her motor and sensory exams were normal.  *Id.* at 302, 342-44.

During her admission, Ms. Jordan was diagnosed with symptomatic anemia with both acute blood loss anemia on top of chronic blood loss anemia with suspected chronic gastrointestinal bleeding; iron deficiency; morbid obesity; chronic back pain; mild malnutrition with hypoalbuminemia; incidental finding of diverticulosis; and gastritis. *Id.* at 306.

On September 19, 2009, Ms. Jordan had a colonoscopy performed which revealed left colon diverticulosis and no other significant potential bleeding lesions cecum to rectum, and no diverticulitis. *Id.* at 306, 315. An esophagogasiro-duodenscopy was performed on September 21, 2009, and showed gastritis and inflammation of the gastric mucosa in the stomach. *Id.* at 317, 347. Ms. Jordan also received a blood transfusion and was discharged on September 23, 2009, with a recommendation to start taking iron supplements. She was also told to avoid all NSAID medications, such as Advil, Aleve, BC Goody powders, because they could increase her risk of bleeding or could also lead to ulcer disease. *Id.* at 307.

Ms. Jordan was transferred on September 24, 2009, to Fort Walton Beach Medical Center for further evaluation regarding her rectal bleeding. *Id.* at 324-28. She was diagnosed with "[w]eakness and hypotension secondary to gastrointestinal bleed and anemia"; gastrointestinal bleed, probably secondary to gastritis and/or diverticulosis; blood loss with iron deficiency, anemia; gastritis; diverticulosis; hypertension; and renal insufficiency, resolved. *Id.* at 324.

Plaintiff was discharged on September 26, 2009, and given Protonix, Ultram, Flexeril, Lisiropril, and Ferrous sulfate. She was told to discontinue Mobic and Relafen and to avoid non steroidal anti-inflammatory medications. *Id.* at 325. During her stay at

Fort Walton Beach Medical Center, Ms. Jordan was evaluated by Andrew F. Ringel, M.D. He stated in his September 24, 2009, report that she had some bright-red blood per rectum which seemed to be hemorrhoids and diagnosed her with a lower gastrointestinal bleed. A bleeding scan was normal. *Id.* at 409-10.

During a follow-up examination by K. Wayne Adkisson, M.D., conducted on April 8, 2010, Ms. Jordan denied "any further hematochezia, melena or any hermatemsis." *Id.* at 340.

On April 13, 2010, Dr. Gilmore, at Panhandle Orthopaedics, completed a medical source statement, noting that Plaintiff experienced gait disturbance, chronic pain and radiculopathy--lumbar disc and low back pain. Ms. Jordan's grip strength was rated at 5/5 and lower extremity strength at 4/5. A hand-held device was not medically necessary for Ms. Jordan to ambulate independently and Ms. Jordan was capable of performing fine/gross manipulations on a sustained basis. *Id.* at 354.[5]

On May 8, 2010, Seymour Goss, M.D., a consultative examiner, examined Plaintiff. *Id.* at 359-64. Gait and station are normal; no signs of inflammation or swelling of the joints was noted; and full range of motion for her joints is also noted. *Id.* at 360. There was no redness or swelling in the back and no paraspinal spasms were noted. Plaintiff bent over and touched her toes "with moderate discomfort on lower back myotomel [sic] distribution area. The pain in the lower back myotomal distribution area

---

[5] The ALJ considered this opinion, but "assigned it little weight, as it was authored well after his final examination of the claimant, which was performed in August 2009. In addition, Dr. Gilmore's own notes from the time he treated the claimant just after the slip and fall indicate the gait disturbance was "mild" and that her lumbar spine was "normal to inspection" with "tenderness" (1F). Additionally, Dr. Gilmore's assessment consists principally of circled and check-marked entries recorded on a pre-printed form, further detracting from the overall persuasiveness of his assessment." *Id.* at 15.

[  ] is same on both sides. . . . Flexion and extension of the spine are normal.  No kyphosis in T-spine.  No CVA tenderness." *Id.*  Plaintiff was "100% mobile during passive and active movements." *Id.*  Other findings were essentially normal.  *Id.* at 360-61; *see id.* at 16.

On June 2, 2010, Plaintiff was examined by Manuel C. Abendan, M.D., at Escambia Community Clinics, with complaints of elevated blood pressure.  *Id.* at 365-66.  Plaintiff did not report chest pain or shortness of breath, no abdominal pain, no peck pain, and no abdominal bleeding.  Her posture and gait were normal and Plaintiff had full range of motion in all joints.  Dr. Abendan examined and diagnosed her with "hypertension, benign essential."  *Id.* at 366.  An abdominal and pelvic ultrasound was performed which showed abdominal swelling and distention.  Dr. Abendan started her on lisinopril-hydrochlorothiazide and recommended a follow-up in three months.  *Id.*

On August 4, 2010, medical consultant Ronald Kline, M.D., performed a physical residual functional capacity (RFC) assessment.  *Id.* at 370-76.  Dr. Kline opined that Plaintiff could perform a full range of light work such as occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand/sit and/or walk with normal breaks about 6 hours in an 8-hour workday.  *Id.* at 371.  Dr. Kline did not note any limitations.  *Id.* at 372-74.  He found that Plaintiff's allegations may be credible but appeared capable of activities within the parameters of the RFC.  *Id.* at 375.  The ALJ stated that Dr. Kline, "consistent with the opinion of Dr. Teitelbaum, opined the claimant capable of performing the full range of light work in August 2010 (Exhibit 10F), and his assessment has been assigned significant weight, as it is consistent with the record as a whole."  *Id.* at 16

Plaintiff was admitted to North Okaloosa Medical Center from May 19 through 24, 2011, with complaints of gastrointestinal bleeding, rectal bleeding, anemia, and hypertension.  *Id.* at 448-63.  A colonoscopy revealed extensive diverticulosis, but no active bleeding.  *Id.* at 448.  Several other studies were performed concerning Ms. Jordan's gastrointestinal complaints, which included an unremarkable abdominal series, a negative bleeding scan, and an unremarkable renal ultrasound.  *Id.* at 457-63.

On May 22, 2011, a single view chest exam was performed because of complaints of GI bleeding and hypertension.  *Id.* at 458.  The findings revealed that the Plaintiff's heart was enlarged and submaximal inspiration was seen.  Ms. Jordan was diagnosed with having a low volume chest with cardiomegaly.  *Id.*  An echocardiogram was also performed on May 22, 2011, and it showed ejection fraction of 50-55%, mild concentric left ventricular hypertrophy, mild tricuspid regurgitation, elevated right ventricular systolic pressure, and no pericardial effusion.  *Id.* at 463.

## V. Legal Analysis

Plaintiff argues that the ALJ erred in failing to apply the correct legal standards in assessing Plaintiff's RFC; erred in not posing complete hypothetical questions to Mr. McKay, the vocational expert, which included all of Plaintiff's limitations; and erred in inadequately assessing Plaintiff's credibility regarding her pain.

### A.  Plaintiff's RFC

Plaintiff argues that the ALJ erred by failing to include in her RFC assessment, Dr. Teitelbaum's restriction that she was limited to lifting only 10 pounds every 10 minutes from the floor to her waist, and that such limitation is at odds with the ALJ's

determination that Plaintiff retained the RFC to perform a full range of light work.  Doc. 12 at 9-11.

The ALJ properly utilized Dr. Teitelbaum's assessment as part of her RFC determination.  A claimant's RFC represents the most she can do despite her credible impairments.  20 C.F.R. § 404.1545(a)(1).  It is based on all the relevant evidence including the objective medical evidence and statements and observations of the claimant's medical sources.  20 C.F.R. §§ 404.1527, 404.1545(a)(1).

In May and June 2009, Plaintiff was examined and treated by Dr. Teitelbaum. On May 27, 2009, Plaintiff first saw Dr. Teitelbaum.  Work-related lower back pain was assessed.  No lifting ("*lift-floor>waist*") greater than 20 pounds and light work was included in the treatment plan.  R. 389, 403.

On June 8, 2009, Plaintiff was again examined by Dr. Teitelbaum after X-rays were taken.  *Id.* at 383, 397.  A diagnosis of lower back pain is noted.  Dr. Teitelbaum noted under functional limitations and restrictions and specifically under functional activity of "*lift-floor>waist*": lifting no greater than 10 pounds every 10 minutes and light work.  *Id.* at 385, 399.

The next visit was on June 15, 2009, and Dr. Teitelbaum's diagnosis was work-related lower back pain.  *Id.* at 380-82, 394-96.  Dr. Teitelbaum noted the following functional limitations and restrictions and specifically under functional activity of "*lift-waist>overhead*" stated: lifting no greater than 10 pounds every 10 minutes and light work.  *There is no mention of a restriction in the functional activity, "lift-floor>waist" category*.  *Id.* at 382, 396; *see supra* at nn.3 & 4.  (These limitations were rendered prior to Plaintiff's alleged onset date of February 2, 2010.  *Id.* at 12.)

Plaintiff was examined by Dr. Gilmore on July 14, 2009, and August 25, 2009. *Id.* at 244, 247.  Plaintiff received physical therapy from July 31, 2009, to August 28, 2008.  *Id.* at 252-58, 263-81.

Dr. Gilmore stated that Plaintiff's work status as of August 25, 2009, was "return to regular duty."  *Id.* at 248.  Plaintiff made progress at physical therapy until she was discharged "due to work comp insurance not authorizing her visits."  *Id.* at 254-55, 263-64.  On April 13, 2010, Dr. Gilmore completed a medical source statement.  *Id.* at 354.

The ALJ afforded significant weight to Dr. Teitelbaum's assessment limiting Plaintiff to light work because it was consistent with the overall evidence of record and supportive of the ALJ's RFC assessment.  *Id.* at 16.  (The ALJ did not give Dr. Teitelbaum's assessment absolute, controlling, or total weight.)  Also, after stating Dr. Teitelbaum's opinion regarding the weight Plaintiff could lift from waist-to-overhead (June 15, 2009) and floor-to-waist (May 27, 2009), the ALJ stated: "There is no indication in the record that these restrictions, given in May and June 2009, were of a permanent nature.[6]  However, the light duty restriction portion of the opinion is consistent with the findings of the State agency consultant and with the observations of the claimant's physical therapist, discussed below."  *Id.* at 15; *see supra* at 22 through 24 for Dr. Goss's consultative report and Dr. Kline's RFC assessment, respectively, considered by the ALJ.  *Id.* at 16 (The ALJ "assigned significant weight" to Dr. Kline's assessment).[7]

---

[6]  The same can be said of Dr. Teitelbaum's June 8, 2009, floor-to-waist assessment.  *See supra* at nn. 3-4.

[7]  Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an

The ALJ considered Dr. Gilmore's examination notes and medical source statement, but assigned the latter "little weight, as it was authored well after his final examination of" Plaintiff, was an assessment consisting "principally of circled and check-marked entries recorded on a pre-printed form," and otherwise inconsistent with his prior examination notes.  *Id.* at 15.  The ALJ also considered the physical therapy discharge notes in conjunction with considering Dr. Gilmore's opinions.  *Id.*

The light work limitation is a significant restriction that accounts for the Plaintiff's physical limitations and demonstrates that the ALJ gave credit to the opinion of Dr. Teitelbaum and others where the opinions were supported by objective medical evidence.  *See* Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (describing light work with environmental restrictions as "significant limitations" demonstrating some credit was given to the opinions of the treating physician); 20 C.F.R. § 404.1567(b) (describing the nature of light work).  The ALJ's findings are supported by substantial evidence and the ALJ correctly applied the law.

### B.  Hypothetical Question for Vocational Expert

Plaintiff also argues that the ALJ erred in not posing complete hypothetical questions to Mr. McKay, the vocational expert, which included all of Plaintiff's limitations.[8]  After determining Plaintiff's RFC, the ALJ compared it to Plaintiff's past work and determined that it allowed the performance of her past relevant work as a

---

individual's impairments must be treated as expert opinion evidence of non-examining sources.  *See* SSR 96-6p.

[8] "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson, 284 F.3d at 1227.  *See* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported.  *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004).

poultry dresser worker and fast food worker.  *Id.* at 17, 39, 169, 183-85.  This argument

is an off-shoot of her previous argument by alleging that the ALJ failed to pose a

complete hypothetical question to Mr. McKay because it did not include

Dr. Teitelbaum's June 8, 2009, functional activity restriction of "*lift-floor>waist*': lifting no

greater than 10 pounds every 10 minutes.

The ALJ's RFC assessment is supported by the overall record including objective

medical findings, Plaintiff's activities, the findings and opinions of Plaintiff's physical

therapist, the assessments of Dr. Teitelbaum that were supported by the record

evidence, *see supra* at 26, and the finding of the State agency physician.  Also, Plaintiff

did not meet her initial burden of showing that she cannot perform her past work.

Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987); Chester, 792 F.2d at 131-32.

*See supra* at 5.

Nevertheless, the ALJ properly utilized the testimony of Mr. McKay to assist her

in defining and determining the demands of Plaintiff's past relevant work and in making

her comparison between Plaintiff's RFC and past work.  *Id.* at 17-18, 39-41.  *See*

20 C.F.R. § 404.1560(b)(2).

"Where the claimant has the [RFC] to do either the specific work previously done

or the same type of work as it is generally performed in the national economy, the

claimant is found not to be disabled."  Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000)

(citing Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)); 20 C.F.R.

§ 404.1520(a)(4)(iv) & (5)(f).  Plaintiff retained the RFC to perform past relevant work

and, as a result, was not disabled at any time through the date of the ALJ's decision.

The ALJ did not err in not including Dr. Teitelbaum's 2009 lifting restriction in the hypothetical questions posed to Mr. McKay.

### C.  Plaintiff's Pain Complaints and Credibility

Lastly, Plaintiff argues that the ALJ erred in not adequately considering her subjective complaints of pain and in not providing adequate reasons for discrediting her pain testimony.

`        At step two of the sequential evaluation process, the ALJ found that Plaintiff has several severe impairments: "bilateral sacroiliitis; diverticulosis; lumbago; obesity; and levoscoliosis of the lumbar region with spondylitic end plate hypertrophy with no canal encroachment."  *Id.* at 12-13.

At step four, an ALJ should consider the credibility of a claimant's statements. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1529(a).  The ALJ should consider whether the claimant's alleged limitations are consistent with daily activities; precipitating and aggravating factors; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; any treatment other than medication received; and any other factors concerning the claimant's functional limitations.  20 C.F.R. § 404.1529(a).  *See supra* at 7-8 for additional standards.

Despite the noted severe impairments and Plaintiff's testimony, the ALJ did not find Plaintiff's statements concerning the intensity, persistence, and limiting effects of her impairments to be "fully credible."  *Id.* at 15.

The ALJ set forth Plaintiff's reports of "experiencing back, hip, toe and joint pain; joint swelling; bowel problems and depression" and her "ability to lift no more than a gallon of milk; sit for not more than 15 minutes; and stand for no more than 10 minutes

without experiencing pain." *Id.* at 14.  The ALJ also discussed Plaintiff's daily activities and her use of two prescribed pain medications "that relieve her pain temporarily." *Id.*; *see id.* at 17.  The ALJ also considered the reports of Plaintiff's cousin in March 2010, regarding Plaintiff's pain.  *Id.* at 14-15.

The ALJ considered the medical evidence and made findings regarding the medical evidence she found most credible.  *Id.* at 15-17.  The medical evidence supports the ALJ's determination that Plaintiff's allegations of pain were not consistent with the degree of severity alleged.  *Id.* at 17.  A lack of objective medical evidence confirming a claimant's allegations may show that such allegations are not entirely credible.  *See generally* Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ properly evaluated the credibility of Plaintiff's alleged impairments and discussed appropriate factors including Plaintiff's and third-party testimony, work activity after Plaintiff's alleged onset of disability, the lack of objective medical evidence to support plaintiffs allege a degree of limitation, medical opinion evidence, activities of daily living, and the effective nature of Plaintiff's treatment.  *Id.* at 12-17.  The evidence supports the presence of limitations consistent with the RFC to perform light work with only occasional climbing ramps and stairs; only occasional balancing, stooping, kneeling, crouching, and crawling; and the inability to use ladders, ropes, or scaffolds.  It does not support, however, disabling limitations.  *Id.*

When the ALJ explicitly finds the claimant statements are not credible and substantial evidence supports this finding, the reviewing court should defer to the ALJ's finding.  *See* Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).  Here, the ALJ provided several reasons for finding Plaintiff's allegations not fully credible and

substantial evidence supports the ALJ's determination.  *See* <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1212 (11th Cir. 2005).

## VI.  Conclusion

Considering the Record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED.**  The Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on August 13, 2012.


<u>s/    Charles A. Stampelos_____</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**